IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs July 9, 2019

## DARION MERRIWEATHER v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 15-06277    J. Robert Carter, Jr., Judge**

_____

### No. W2018-01373-CCA-R3-PC
_____

The petitioner, Darion Merriweather, appeals the denial of his petition for post-conviction relief, which petition challenged his guilty-pleaded conviction of carjacking, alleging that he was deprived of the effective assistance of counsel and that his guilty plea was not entered into knowingly and voluntarily.  Because the record establishes that counsels' performance was deficient and that the petitioner's guilty plea was unknowing and involuntary, we reverse the denial of post-conviction relief, vacate the petitioner's guilty plea, and remand for trial.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Reversed; Vacated; and Remanded.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, and J. ROSS DYER, JJ., joined.

Benjamin Israel, Memphis, Tennessee, for the appellant, Darion Merriweather.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Glen Baity, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The petitioner and two co-defendants were charged with, among other things, carjacking the victim, Ronald Little.  At the petitioner's plea submission hearing, the parties stipulated to the following facts:

> [O]n July the 10th, 2015, Ronald Little was driving a 2000 Daewoo when he approached the stop sign at Palm and Marynelle located here in Shelby County, Tennessee.  Three

individuals came to his car, one flashed a silver and black handgun [and] demanded that the car be given. The three individuals were later identified to be William Farmer, Marsh[u]wn Brown and Dari[o]n Merriweather. They were caught in the vehicle by the police officers on Old Getwell Road.

Pursuant to the plea agreement, the trial court imposed a Range I sentence of 10 years' incarceration, and the State dismissed the charges of employing a firearm during the commission of a dangerous felony and evading arrest contained in the original indictment as well as charges of aggravated robbery and evading arrest contained in a superseding indictment.

The petitioner filed a timely pro se petition for post-conviction relief. After the appointment of counsel, the petitioner filed an amended petition for post-conviction relief, alleging that "his guilty plea was not given knowingly and voluntarily."[1]

At the evidentiary hearing, trial counsel,[2] who was admitted to the practice of law in June of 2016, testified that he began practicing law and joined co-counsel's law firm about six months prior to the petitioner's December 2016 trial. At the time of the petitioner's trial, trial counsel had "sat second chair for [co-counsel] on one trial," but he had never cross-examined a witness; the petitioner's case was the first in which trial counsel intended to act as first chair counsel. Trial counsel testified that he met the petitioner for the first time on December 5, 2016, the day of the scheduled trial. Despite having never previously met with the petitioner, trial counsel contended that he "was extremely well prepared" for trial and "would have been ready to try th[e] case that day."

Trial counsel said that he prepared for trial by reviewing discovery materials, visiting the crime scene, taking pictures, reviewing statements of the co-defendants for inconsistencies, and reviewing the recording of the preliminary hearing. His defense strategy was to call into doubt the eyewitness' testimony based on the distance from which she viewed the incident and to attack the testimony of the co-

---

[1] The amended petition in the record appears to be missing one or more pages. From the argument provided, it appears that the petitioner also raised a claim of ineffective assistance of counsel although that claim is not enumerated in the pages provided. Because the post-conviction court specifically addressed that issue in its order denying relief, we will assume that the issue was properly raised in the amended petition.

[2] Because the petitioner was represented by two attorneys, we will refer to the first chair attorney as "trial counsel" and the second chair attorney as "co-counsel."

defendants as being biased due to their having received favorable plea deals in exchange for their testimony. He recalled that Mr. Little, the victim, and Carolyn Little, an eyewitness, could identify the petitioner as one of the carjackers. He acknowledged that, at a preliminary hearing, Mr. Little had misidentified the petitioner but asserted that, at some point, Mr. Little had identified the petitioner from a photographic line up. Trial counsel stated that he noted from the transcript of the preliminary hearing that Mr. Little's testimony was somewhat inconsistent. Trial counsel stated that the petitioner asserted that he was not present during the carjacking but "was just in the car" at the time of the arrests.

Trial counsel acknowledged that he did not discuss the petitioner's potential testimony and the potential testimony of co-defendant William Farmer until his first meeting with the petitioner on the day of the scheduled trial. Trial counsel explained that Mr. Farmer had pleaded guilty, that trial counsel "was under the impression that [Mr. Farmer] was going to be one of the witnesses," and that, if Mr. Farmer had not testified, then co-defendant Marshuwn Brown would have. Trial counsel acknowledged that he did not know for certain whether the State intended to call Mr. Farmer as a witness, but he assumed that Mr. Farmer would testify because he did not "think that [the State] would have pled him out if he wasn't going to testify." He estimated that he talked with the petitioner during their first and only trial strategy meeting for what "[c]ould have been half an hour" about "the pros and cons at trial, the risks of trial, the likeliness that we would have . . . of winning at trial, and what the sentencing could look like if we lost." Trial counsel acknowledged that the petitioner voiced a concern about accepting the plea offer, but trial counsel asserted that the petitioner "also expressed misgivings about going to trial."

Trial counsel explained that the State's first plea offer provided for a sentence of eight years to be served at 85 percent release eligibility but that he negotiated a new plea agreement that provided for a sentence of 10 years with 30 percent release eligibility. The State made the new plea offer on the day of the scheduled trial, and trial counsel relayed the offer to the petitioner, explaining to the petitioner that he would be able to seek parole after serving three years of his sentence. Trial counsel testified that, at the time, he had never had a client who had appeared before the Parole Board, but he nevertheless advised the petitioner to "get in to as many programs as you can" and do "whatever you can [to] . . . make yourself a better person" and "you should have a good chance of getting parole." Trial counsel stated that it was his "understanding at the time" that the petitioner would be granted parole as long as he avoided disciplinary issues while incarcerated. Trial counsel acknowledged that he told the petitioner that "it [wa]s very likely, that he ha[d a] strong possibility" of being granted parole. When asked whether he guaranteed the petitioner parole, trial counsel responded, "I think what I said is he has

-3-

-- it is very likely, that he has a strong possibility" of being granted parole at his first parole hearing. He speculated that the petitioner's being denied parole was "probably because of things that happened when he's been in TDOC." He argued that the petitioner would receive a second parole hearing "still long before he would have be[e]n looking at parole on the original" plea offer.

Trial counsel stated that, "[u]nder the circumstances," he believed that the petitioner should have "absolutely" taken the plea offer, explaining that the petitioner's case was going to be transferred to a different division of the court. Trial counsel advised the petitioner that the case's being transferred to a new division "changed the -- the picture" because "there was no chance of anything . . . less than the maximum consecutive" sentence if convicted, despite that the petitioner had no criminal history.

Trial counsel stated that he did not file any pretrial motions because the issues "were all jury questions" regarding witness credibility. He suspected that co-counsel "may have filed a motion to suppress the identifications" made by the State's witnesses, but he anticipated that "the Judge probably would have let it . . . go to the jury." When asked if he had moved to suppress statements from the co-defendants, trial counsel responded, "I don't think that would require a motion. I think that would be a hearsay objection." He stated that both co-defendants gave statements identifying the petitioner as the perpetrator, but, after reviewing his file, he acknowledged that Mr. Farmer had refused to give a statement. He recalled that he "definitely advised [the petitioner] that Mr. Farmer was going to testify."

Trial counsel stated that he was unaware of whether the petitioner suffered from any mental health issues or whether the petitioner had undergone a mental evaluation.

During cross-examination, trial counsel stated that co-counsel was an experienced trial attorney and that, although trial counsel was going to be the first chair attorney in this case, co-counsel "was going to be [at trial] writing notes." Despite having never met with the petitioner before the day of the scheduled trial, trial counsel asserted that he had done the legwork in this case. He contended that this was not a complicated case, agreeing that the petitioner was in the stolen car when police stopped it. The State's original plea offer required the petitioner to plead guilty to the charges in the superseding indictment in exchange for an eight-year sentence with 85 percent release eligibility, and trial counsel stated that the petitioner "certainly understood the difference between [eight] at 85 [percent] and 10 at 30 [percent]." Trial counsel noted that the petitioner was "especially concerned about the risk of 12 [years] at 85 [percent]."

-4-

When the petitioner expressed a desire to be incarcerated at the Penal Farm, trial counsel told the petitioner that he was unsure when the petitioner would be taken to the Department of Correction ("TDOC") from the Penal Farm due to the State's switching to new computer software. He told the petitioner, "Given the circumstances . . . , how chaotic everything is in the jail, I have no idea how long it will be, it could be a while." Trial counsel also told the petitioner that "there [we]re people also on sentences longer than six years that for whatever reason get kept in the Penal Farm." He stated, however, that the petitioner understood that there was no guarantee that he would be kept at the Penal Farm for the duration of his sentence.

Trial counsel stated that the petitioner's primary concerns were the length of his sentence and his parole eligibility. He said that he did not think that the petitioner was concerned about being granted parole at the time he entered his plea because "he was pretty confident that he was going to get paroled." Although trial counsel stated that he did not expressly promise the petitioner that he would be granted parole, he told the petitioner that "he had a good shot at it, you know, a good likelihood" and that "he was a good candidate" in part because "he had [n]ever been in trouble before."

When asked whether the petitioner had witnesses that he wished trial counsel to interview, trial counsel stated, "So I think he . . . had some family members who were going to say that he got in the car later on." Trial counsel then stated that the petitioner had no alibi witnesses. Despite having never spoken to the petitioner, trial counsel testified that he did everything that the petitioner had asked in preparing for trial.

On redirect examination, trial counsel explained that this was a straightforward case because the petitioner had been identified by Mr. and Ms. Little and had been implicated by a co-defendant's statement. He recalled that he reviewed with the petitioner Ms. Little's statement in which she said that she "did not see them actually take the car," but "she did see them right beforehand, and saw them -- you know, making eyes at the car." Trial counsel estimated that approximately one to two hours passed from the time of the carjacking to the time of the petitioner's arrest.

Co-counsel testified that he was retained to represent the petitioner on the carjacking charge, but he could not recall specifically when he began working on the petitioner's case. Co-counsel was the attorney of record for the duration of the case, but co-counsel stated that he and trial counsel were law partners and that he would have discussed the petitioner's case with trial counsel. In preparing for this case, co-counsel talked with the petitioner, "got a copy of the indictment," and "basically explain[ed] . . . what was involved." Co-counsel explained that trial counsel "got all of the discovery" materials because "he was going to b[e] the one that was trying it." Co-counsel stated

that he did not prepare the petitioner to testify. It was his and trial counsel's practice to "discuss every case before [they] tr[ied] it," but it was trial counsel's responsibility to discuss with the petitioner what evidence was likely to be admitted at trial. Co-counsel explained that he and trial counsel "would have discussed any legal issues that . . . could have been raised," but trial counsel "would have been primarily responsible for pretty much putting it together, the strategy, and the discovery and everything else like that." Co-counsel acknowledged that he was equally responsible for communicating the defense position to the petitioner.

Co-counsel recalled visiting the petitioner in jail once but could not remember whether trial counsel joined him on that visit. He did not file any pretrial motions. He reiterated that trial counsel would have been the first chair attorney if the case had gone to trial and that he would have "had to do very little" unless something arose that he believed needed to be addressed. He testified that, if the State made an initial offer in this case, he would have discussed it with trial counsel. Co-counsel could not recall whether he was aware of any mental health issues of the petitioner.

The petitioner testified that his mother had hired co-counsel to represent him in this case. He met with co-counsel three times before entering his guilty plea. At the first meeting, co-counsel did not have any discovery materials or the transcript from a prior proceeding. Co-counsel likewise did not bring any discovery materials to the second meeting, which occurred approximately three months after the first meeting. When the petitioner finally did receive discovery materials, he told co-counsel that he did not understand co-counsel's explanation of the discovery materials. The petitioner asserted that he did not intend to plead guilty although co-counsel had relayed to him a plea offer for 10 years' incarceration with 30 percent release eligibility. He stated that he did not understand the meaning of release eligibility and that trial counsel explained to him that parole meant he "would be released" to complete "the rest of [his] time in society." The petitioner said that he understood this to mean that parole was guaranteed after serving 30 percent of his sentence.

The petitioner testified that he thought the December 5 proceeding was to be an evidentiary hearing to determine "if the State had enough evidence to take the case to trial"; he did not know that his case was scheduled for trial that day. He testified that co-counsel told him that if the State did not have enough evidence on which to proceed, the petitioner would "go home." The petitioner stated that he had never met trial counsel before December 5, when trial counsel spoke with him "in the tank back here behind the court." On December 5, the petitioner met with both trial counsel and co-counsel, and both attorneys told him that if the petitioner did not accept the plea offer, his "case would be moved to a courtroom with . . . harsher sentencing" where he would face a sentence of

eight to 30 years. He stated that neither attorney explained why his case would be transferred to a different court, and he believed that if he declined the plea offer, he would face up to 30 years' incarceration on the charge of carjacking because he had "never even received the [i]ndictment for aggravated robbery." He said that both attorneys advised him that Mr. Farmer had given a statement implicating the petitioner in the crime and that both Mr. Farmer and Mr. Brown were going to testify against him; however, upon his own review of the discovery materials, the petitioner learned that Mr. Farmer did not give a statement. He asserted that neither trial counsel nor co-counsel explained to him that Mr. Brown's statement could be deemed inadmissible.

The petitioner testified that he had undergone a mental evaluation, which deemed him "mentally disabled" but otherwise competent to stand trial. He had been diagnosed with ADHD and ADD as a child, and he was later diagnosed with bipolar and paranoid schizophrenic disorders. The petitioner took medication for those conditions. The petitioner acknowledged his responses during the plea colloquy but pointed out that he had told the judge that he "didn't want to sign [the plea agreement] if [he] wasn't going to the Penal Farm." He explained that he answered the judge's questions in the way that he did because the judge had told him that he would be sentenced to eight to 30 years, which statement led the petitioner to believe that "it was law." The petitioner stated that he accepted the plea agreement because he did not feel that he had any other option. He recalled that on the same day that he entered his guilty plea, he had told his mother that he intended to reject the plea offer and that he only changed his mind when his attorneys told him that he was facing 30 years' incarceration without the possibility of parole. He stated that they told him that if he was convicted, he "would not get nothing less than the max" sentence, and he did not have confidence that they would defend him if he chose to go to trial. The petitioner testified that he had no prior felony convictions at the time of his plea and contended that, had he known that he was facing only eight to 12 years' incarceration, he would have rejected the plea offer.

Upon questioning by the court, the petitioner stated that his attorneys told him "that an Alford . . . plea was a best interest plea" and "wasn't a guilty plea" and that, as a result, he believed that he would still "have my innocence." He said that he understood a guilty plea to be an admission to having committed the alleged offense, but "a best interest plea [wa]s taking the time that you feel like is best for you -- best deal that you're going to get." He acknowledged that he understood that in entering the *Alford* plea, he would be accepting a sentence.[3]

---

[3]     In *North Carolina v. Alford*, 400 U.S. 25, 37 (1970), the United States Supreme Court held that a criminal defendant may enter a guilty plea without admitting guilt if the defendant intelligently concludes that his best interests would be served by a plea of guilty.

During cross-examination, the petitioner reiterated that he thought the December 5 proceeding was to be an evidentiary hearing and that the trial date would be set after the hearing. He understood trial counsel's explanation of parole to be a guarantee that he would receive parole as long as, during his incarceration, he avoided disciplinary actions and participated in prison programs.

The petitioner stated that he reviewed the discovery materials and understood that the primary issue was the identification of the petitioner. He acknowledged that the case had previously been dismissed in general sessions court because no witness was able to identify the petitioner as one of the perpetrators. The petitioner asserted that he wanted to go to trial.

The petitioner did not think that he had been indicted for aggravated robbery, explaining, "I thought you had to receive an Indictment . . . for you to be tried." He believed that if he had gone to trial, it would have been for the carjacking charge. Regarding an aggravated robbery charge, he acknowledged that his attorneys had "brought it up before," but he asserted that they did not explain the difference between carjacking and aggravated robbery in terms of parole eligibility. He said that he recalled the judge's "saying there's a superseding Indictment" at the plea submission hearing and the judge's telling him the sentencing differences under the superseding indictment. He reiterated that he pleaded guilty because he did not feel like he had another option, stating "I felt like I was going to get the maximum when I got to a different courtroom." He stated that the difference in sentencing between the carjacking and aggravated robbery charges played no part in his deciding to plead guilty. The petitioner recalled telling the judge at the plea submission hearing that he had taken his medication the night before and that he understood the proceeding. He acknowledged that he stated that his plea was voluntary at the plea submission hearing.

Patricia Merriweather, the petitioner's mother, testified that she was unaware that the December 5 proceeding was to be the trial. She stated that when she spoke with co-counsel, "he said that he had to set a court date for a hearing." On December 5, co-counsel told her that he "was ready to set a court date for trial." She also stated that because a jury had not yet been selected, she did not think that the trial was scheduled. She had a doctor's appointment on December 5, and, after receiving assurances from co-counsel, she told the petitioner not to sign any paperwork and left for her appointment. It was her understanding that the petitioner did not intend to sign a plea agreement that day. She stated that she did not want the petitioner to sign anything because he "has a lot of mental issues."

Ms. Merriweather said that she retained co-counsel to represent the petitioner because she believed that co-counsel "was going to be looking out for his best interest," but she felt that that was not the case. She recalled that she communicated only with co-counsel throughout the case and never spoke with trial counsel. She said that if she had been aware of co-counsel's faulty memory, she "wouldn't have put him up over my son's case like that."

Ms. Merriweather testified that the petitioner had always had mental health issues, saying, "[W]hen he was first born he wouldn't go around people. So they diagnosed him with . . . a[u]tism." Later, "they diagnosed him with ADHD and ADD." Most recently, the petitioner was diagnosed with "bipolar and paranoid schizophrenic" disorders. She said that the petitioner did not do well in school, explaining that "[h]e couldn't go any further" than the ninth grade "because he couldn't learn anything. So I took him out, and we homeschooled him at home. That's why he never was in the public or out in . . . the world, because he was always around us." Ms. Merriweather stated that the petitioner struggled with comprehension in reading, math, and other subjects. He also struggled with verbal explanations, but he had gotten "smarter since he's been incarcerated" and was "doing a lot better now." Ms. Merriweather told co-counsel of the petitioner's competency issues, relaying to him the petitioner's "struggles and the things that he went through in the past, all of that." She also told co-counsel that a prior mental evaluation deemed the petitioner to be "mentally unstable or what have you."

The transcript of the petitioner's plea submission hearing was exhibited to the evidentiary hearing. During the plea hearing, the trial court explained to the petitioner: "By agreement the State is allowing you to plead to that original carjacking charge. It carries eight to thirty years." Later, the petitioner asked the court whether he would be detained at the Penal Farm, and the court responded that it would sentence the petitioner to TDOC, but "sometimes they keep people and assign them to the correctional center on these cases" and "whether they keep you or not, that's always a possibility." The petitioner told the court, "I told my lawyers I didn't want to sign if I weren't going to the penal farm," to which the court responded, "Well, so are you telling me you would rather have a jury trial and take a chance on eight to thirty years in the penitentiary at a no parole?" After a discussion with trial counsel, the court told the petitioner that it could not guarantee that the petitioner would be housed at the Penal Farm and asked the petitioner, "Do you want to talk it over? Are you telling me you would rather go to trial and risk eight to thirty years . . . on a non-parolable offense? You know, that's the only other option I have?" After the court concluded the plea colloquy, co-counsel informed the court that the petitioner was on "some serious medication" but had "been examined" and was declared competent to stand trial. The trial court then conducted an additional colloquy regarding the petitioner's medication and ability to understand the proceedings,

and the petitioner again said, "I talked to my lawyers, I thought I was going to the penal farm." The court told the petitioner that "they may keep you there but I can't order it" and that if the petitioner was "thinking that it's got to be a guarantee, then I can't accept the plea. But if you understand that it may very well happen but you want to get this behind you . . . however you have to do it; is that right?" The petitioner responded, "Yes, sir."

In its written order denying relief, the post-conviction court found that trial counsel was the lead attorney and co-counsel was the second attorney on the petitioner's case and that both "were prepared, informed and had communicated with their client." The court concluded that neither attorney had guaranteed that the petitioner would be granted parole but had instead told him "that his behavior would be his best way of helping his chances." The court also found that the petitioner's plea colloquy "indicate[d] that [the p]etitioner understood what he was doing, including the effects of an 'Alford plea'" and that the petitioner's primary concern was with where he would serve his sentence. The court concluded that the petitioner "chose to enter a negotiated plea that was clearly entered freely and voluntarily with the advice of competent counsel."

In this appeal, the petitioner argues that his attorneys performed deficiently by failing to explain the consequences of his guilty plea, failing to prepare the petitioner for trial, failing to assess what the petitioner's potential testimony would be, and failing to familiarize themselves with the evidence. Furthermore, the petitioner asserts that, as a result of counsels' deficient performance, his guilty plea was not made knowingly and voluntarily.

We view the petitioner's claim with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence *preponderates* against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

*I. Ineffective Assistance of Counsel*

Before a petitioner will be granted post-conviction relief based upon a claim of ineffective assistance of counsel, the record must affirmatively establish, via facts clearly and convincingly established by the petitioner, that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and that counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When considering a claim of ineffective assistance of counsel, a reviewing court "begins with the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all significant decisions," *Kendrick v. State*, 454 S.W.3d 450, 458 (Tenn. 2015) (citation omitted), and "[t]he petitioner bears the burden of overcoming this presumption," *id.* (citations omitted). We will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

In the context of a guilty plea, the petitioner must establish that "counsel's constitutionally ineffective performance affected the outcome of the plea process" by establishing "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985); *see Hicks v. State*, 983 S .W.2d 240, 246 (Tenn. Crim. App. 1998).

Here, the petitioner alleges that his attorneys failed to explain the consequences of his guilty plea, failed to prepare him for trial, failed to assess what his potential testimony would be, and failed to familiarize themselves with the evidence. The post-conviction court found that both attorneys "were prepared, informed and had communicated with" the petitioner. The record, however, preponderates against the

-11-

findings of the post-conviction court. Trial counsel testified that the first and only time he met with the petitioner was on the day of the scheduled trial for what "[c]ould have been half an hour." Regardless of trial counsel's other preparations in this case, we cannot say that trial counsel was adequately prepared for trial having never spoken with the petitioner before the day of trial. *See* Tenn. R. Sup. Ct. 8, RPC 1.4(a)(2)-(3); -(b) (requiring a lawyer to "reasonably consult with the client about the means by which the client's objectives are to be accomplished," to "keep the client reasonably informed about the status of the matter," and to "explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation"). Trial counsel testified that he negotiated the final plea offer with the State; however, considering that trial counsel had never spoken to the petitioner, trial counsel could not have told him about the State's first plea offer. Additionally, considering that the petitioner did not know that trial counsel was one of his attorneys, the petitioner could not have consented to trial counsel's negotiating a plea agreement on his behalf. The record established that co-counsel had little to no involvement in the negotiations with the State and engaged in no trial preparation.

Furthermore, trial counsel testified that, although he did not "know for sure" whether co-counsel had moved to suppress the victim's identification of the petitioner, he suspected that co-counsel may have done so because that was his usual practice. Trial counsel also testified that he thought the petitioner "had some family members who were going to say that he got in the car later on," but trial counsel did not indicate whether he actually interviewed any of those potential witnesses. We cannot say that trial counsel's dismissal of the petitioner's alibi defense was a strategic decision because counsel did not investigate the potential alibi. In fact, trial counsel testified that the petitioner had no alibi witnesses, despite having also testified that he thought some of the petitioner's family members would have testified that the petitioner was not present during the carjacking. We conclude that trial counsel was not adequately prepared for trial; he had no knowledge of whether the trial court had already ruled on the admissibility of certain evidence, he did not know what pretrial motions had been filed, and he made no effort to investigate the petitioner's alibi. Moreover, trial counsel testified that he did everything that the petitioner had asked in preparing for trial; however, he admitted that he had never even met the petitioner before the day the petitioner pleaded guilty. Based on trial counsel's own testimony, we conclude that trial counsel failed to adequately prepare for the petitioner's scheduled trial.

Moreover, the record reveals that the divided labors between attorneys created gaps in performance. Trial counsel's testimony established that co-counsel failed to disclose the petitioner's mental health issues to trial counsel and suggests that trial counsel was not completely familiar with the petitioner's case. Trial counsel testified that

he did not know about the petitioner's prior mental health evaluation or the petitioner's mental health issues. Ms. Merriweather testified, however, that she alerted co-counsel to the petitioner's mental health diagnoses, and co-counsel claimed to have relayed all relevant information to trial counsel. Ms. Merriweather's testimony is corroborated by the fact that, at the preliminary hearing, co-counsel informed the court that the petitioner had undergone a mental evaluation and that he took medication for mental health issues. The petitioner and Ms. Merriweather testified consistently that the petitioner had undergone a mental health evaluation that deemed him "mentally disabled" but otherwise competent to stand trial. Importantly, the post-conviction court found that "[t]here's a competency letter in the file that's copied to [co-counsel].[4]

Given that neither the petitioner nor his mother knew that trial counsel would represent the petitioner at trial, they had no opportunity to apprise trial counsel of the petitioner's mental health issues. Trial counsel's testimony that he did not know about the petitioner's mental health issues indicates a lack of familiarity with the case, particularly given the evidence in the record that co-counsel had been informed of the results of the petitioner's competency evaluation.

In addition to his lack of awareness of the petitioner's mental health evaluation, trial counsel was unaware that co-defendant Farmer had failed to implicate the petitioner in the offenses. Instead, he erroneously informed the petitioner that Mr. Farmer had not only implicated the petitioner but that he would testify against the petitioner at trial.

We conclude that the failure to inform the petitioner that trial counsel was joining the defense team and would be the lead attorney at trial constitutes deficient performance. This conduct evidences an utter lack of communication with the petitioner to the extent that the petitioner did not even know that trial counsel was his attorney. The petitioner asserted that he did not want to enter a guilty plea, but he felt that he had no other option because both attorneys told him that he would receive the maximum sentence if convicted at trial, a sentence that he erroneously believed to be as much as 30 years, and because he did not believe that they would defend him if he elected to go to trial. The petitioner testified that he would have declined the plea offer had he understood the consequences of his plea and the risks of trial. We conclude that counsels' performance was deficient. In effect, in this case, the performance of two attorneys equaled less than one. The issue of prejudice is intertwined with the issue of whether the plea was knowingly and voluntarily made, and we move on to view the case via that lens.

---

[4] This letter is not included in the record on appeal.

## II. Validity of Guilty Plea

Additionally, the petitioner contends that he pleaded guilty unknowingly and involuntarily. Specifically, the petitioner alleges that his attorneys' errors combined with the trial judge's misstating his sentencing exposure resulted in "coercive circumstances" that "overwhelmed him."

Apart from whether a guilty plea is the product of ineffective assistance of counsel, it is invalid if otherwise made unknowingly or involuntarily. "Whether a plea was knowing and voluntary is an issue of constitutional dimension because 'the due process provision of the federal constitution requires that pleas of guilty be knowing and voluntary.'" *State v. Wilson*, 31 S.W.3d 189, 194 (Tenn. 2000) (quoting *Johnson v. State*, 834 S.W.2d 922, 923 (Tenn. 1992)). A plea "may not be the product of '[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats." *Wilson*, 31 S.W.3d at 195 (quoting *Boykin v. Alabama*, 395 U.S. 238, 242-43 (1969)); *see also State v. Mellon*, 118 S.W.3d 340, 345 (Tenn. 2003) (citing *Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn.1993)).

Like a claim of ineffective assistance of counsel, a claim of involuntary guilty plea is a mixed question of law and fact. *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010); *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). When reviewing the application of law to the post-conviction court's factual findings, our review is de novo, and the post-conviction court's conclusions of law are given no presumption of correctness. *Fields*, 40 S.W.3d at 457-58; *see also State v. England*, 19 S.W.3d 762, 766 (Tenn. 2000).

As stated above, both of the petitioner's attorneys performed deficiently by failing to adequately communicate with the petitioner that trial counsel would be handling the petitioner's case and failing to adequately communicate with each other all the pertinent information about the case. To compound these errors, the trial court misstated the petitioner's sentencing exposure during the plea colloquy, stating that the petitioner faced up to 30 years' incarceration if convicted at trial. To be sure, aggravated robbery, a Class B felony, *see* T.C.A. § 49-13-402(b), carries a sentence of eight to 30 years, *see id.* § 40-35-111(b)(1), but our legislature has delineated sentencing ranges narrowing the potential sentence for each class of offender. *See id.* § 40-35-112. The petitioner's uncontroverted testimony established that he had no prior felonies, which qualified him as a Range I offender, *see id.* § 40-35-105(a)-(b), and, as a Range I offender, he faced a potential sentence of only eight to 12 years, *see id.* § 40-35-112(a)(2). The trial court, however, incorrectly told the petitioner three times that he was

-14-

facing a 30-year sentence – once at the beginning of the hearing and twice in response to the petitioner's telling the court that he did not want to plead guilty if he would not be permitted to serve his sentence at the Penal Farm.

The trial court also misstated that aggravated robbery was "a non-parolable offense"; however, by statute, aggravated robbery carries a release eligibility percentage of 85 percent. *See* T.C.A. § 40-35-501(k)(1). The court's misstatements coupled with trial counsel's assuring the petitioner that he would receive the maximum sentence if convicted at trial led the petitioner to believe that he would be sentenced to 30 years' incarceration without the possibility of parole if convicted of aggravated robbery at trial. These errors are sufficient to render the guilty plea unknowing and involuntary.

We conclude that the combined effect of the deficient representation provided by the petitioner's attorneys and the misinformation provided by the trial court rendered the petitioner's guilty plea unknowing and involuntary.

Accordingly, the judgment of the post-conviction court is reversed, the petitioner's guilty-pleaded conviction of carjacking is vacated, and the case is remanded for trial.

_____
JAMES CURWOOD WITT, JR., JUDGE